635 F.2d 859
 105 L.R.R.M. (BNA) 2818, 204 U.S.App.D.C. 4,
89 Lab.Cas. P 12,289
 DONALD SCHRIVER, INC., Sullivan-Kelley & Associates, Topaz
Contracting & Development Company, Inc., and
Sullivan and Associates, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondents,
Los Angeles Building and Construction Trades Council,
Carpenters Local No. 1497 et al., Intervenors.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOS ANGELES BUILDING AND CONSTRUCTION TRADES COUNCIL et al.,
Respondents,
Donald Schriver, Inc. et al., Intervenors.
 Nos. 78-2177, 79-1001.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued June 17, 1980.
Decided Oct. 20, 1980.
 
 Petition for Review and Application for Enforcement of an order of the National Labor Relations Board.
 Gerard C. Smetana, Chicago, Ill., with whom William H. DuRoss, III, Washington, D.C., was on the brief for Schriver, Inc., petitioner in No. 78-2177 and intervenor in No. 79-1001.
 John H. Ferguson, Atty., N.L.R.B., Washington, D.C., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel and William M. Bernstein, Atty., N.L.R.B., Washington, D.C., were on the brief for respondent in No. 78-2177.
 Laurence J. Cohen, Washington, D.C., with whom William Chapman, New York City, George Kaufmann, Robert D. Kurnick and Laurence Gold, Washington, D.C., were on the brief for Los Angeles Bldg. and Const. Trades Council, intervenor in No. 78-2177 and respondent in No. 79-1001.
 Leo Geffner, Los Angeles, Cal., for Carpenters Local No. 1497, et al., intervenors in 78-2177 and respondents in No. 79-1001.
 Vincent J. Apruzzese, Springfield, N.J., Stephen A. Bokat, Lawrence B. Kraus, Washington, D.C., and Francis A. Mastro, Springfield, N.J., were on the brief for the Chamber of Commerce of the United States, amicus curiae in Nos. 78-2177 and 79-1001.
 Kenneth C. McGuiness, Robert E. Williams and Daniel R. Levinson, Washington, D.C., were on the brief for Air Conditioning & Refrigeration Institute, et al., amicus curiae in Nos. 78-2177 and 79-1001.
 Robert J. Hickey and Peter G. Kilgore, Washington, D.C., were on the brief for Associated Gen. Contractors of America, Inc., amicus curiae in Nos. 78-2177 and 79-1001.
 TABLE OF CONTENTS
 Page
 I. FACTUAL AND PROCEDURAL BACKGROUND .................................. 862
 A. The Facts Involving Donald Schriver, Inc....................... 862
 B. The Facts Involving Topaz Contracting and Developing Co., Inc.. 865
 C. Proceedings Before the Board .................................. 865
 II. STATUTORY FRAMEWORK AND THE SUPREME COURT DECISION IN CONNELL ...... 867
 A. Statutory Framework ........................................... 867
 B. The Supreme Court Decision in Connell ......................... 870
III. SUFFICIENCY OF A Sec. 8(f) RELATIONSHIP TO SATISFY CONNELL ............ 872
 IV. THE SCOPE OF THE CONSTRUCTION INDUSTRY PROVISO TO Sec. 8(e) ........... 876
 A. Limitation With Respect to Particular Jobsites ................ 876
 B. The Relevance of Physical Presence at the Jobsite ............. 883
 C. The Legality of Union-Specific Clauses ........................ 884
 D. Deference to the Board ........................................ 886
 V. THE SELF-ENFORCEMENT FEATURE OF THE AGREEMENTS ..................... 886
 VI. CONCLUSION ......................................................... 887
 Before McGOWAN and EDWARDS, Circuit Judges, and KASHIWA,* Judge, United States Court of Claims.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 EDWARDS, Circuit Judge:
 
 
 1
 We are called upon in this case to review a decision and order of the National Labor Relations Board concerning the legality of certain subcontracting agreements in the construction industry, in light of the construction industry proviso to § 8(e) of the National Labor Relations Act. Three principal issues are raised.
 
 
 2
 The first issue presented is whether subcontracting agreements in the construction industry are lawful if sought as part of a "prehire agreement" authorized by § 8(f) of the Act. The resolution of this issue turns on the meaning to be ascribed to the decision in Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), where the Supreme Court held that a subcontracting agreement may only be sought in the context of a "collective-bargaining relationship." The second issue presented concerns the proper scope of the construction industry proviso to § 8(e). In particular, we are called upon to consider whether subcontracting agreements in the construction industry must be negotiated on a jobsite by jobsite basis or, if not, whether they must at least be limited in application to particular jobsites at which both union and nonunion workers are employed. Also raised as a part of this second issue is the question whether subcontracting agreements lawfully may require subcontractors to be signatory to an agreement with a "particular" union. The third and final issue presented is whether subcontracting agreements may be included in a contract that also authorizes the union to take "any" action to enforce "any" settlement or decision rendered pursuant to a contractual grievance and arbitration procedure.
 
 
 3
 We hold that subcontracting agreements may be included in a "prehire agreement" between a contractor and a labor organization in the construction industry. In addition, we hold that such agreements need not be renegotiated at each jobsite or limited in application to particular jobsites at which both union and nonunion workers are employed; we also hold that such agreements may be "union-specific." Finally, we hold that a subcontracting agreement may not be included in a contract such as the present that authorizes the union to take "self-help" measures to enforce the agreement.
 
 
 4
 We turn to consider each of these issues in detail.
 
 I. FACTUAL AND PROCEDURAL BACKGROUND
 
 5
 On June 20, 1975 and on March 9, 1977, unfair labor practice charges were filed alleging that certain labor organizations had improperly coerced two construction contractors to enter into subcontracting agreements prohibited by § 8(e) of the National Labor Relations Act.[1] The charges filed on June 20, 1975 stemmed from incidents involving Donald Schriver, Inc. ("Schriver"); the charges filed on March 9, 1977, and amended on March 15, 1977, stemmed from incidents involving Topaz Contracting and Developing Co., Inc. ("Topaz"). Complaints were issued by the Regional Director in each case and, on April 28, 1977, the two cases were consolidated. App. 39.[2] The Regional Director issued a consolidated amended complaint on July 6, 1977. App. 41.
 
 
 6
 The parties waived all proceedings before an Administrative Law Judge, and submitted a motion to transfer the case directly to the National Labor Relations Board. App. 52. At the same time the parties entered into a complete stipulation of facts. App. 55. On November 4, 1977 the Board granted the motion to transfer, and the case was heard on the following stipulated facts.
 
 
 7
 A. The Facts Involving Donald Schriver, Inc.
 
 
 8
 Donald Schriver, Inc. is a developer and general contractor in the building and construction industry in southern California. App. 57, P 7(a).[3] Schriver falls within the territorial jurisdiction of the Los Angeles Building and Construction Trades Council ("Trades Council") and Local 1497, United Brotherhood of Carpenters and Joiners of America ("Local 1497"). Schriver directly employs only carpenters and one full time laborer. All other jobsite work assumed by Schriver is subcontracted to other contractors. App. 62, P 14.
 
 
 9
 In June of 1972, Schriver was engaged as owner-builder in the construction of a four-unit apartment complex in Montebello, California. App. 62, P 15. While working on that project, Schriver entered into a standard agreement with the Trades Council. That agreement contained certain general terms and, more importantly, also incorporated by reference the Master Labor Agreement ("MLA") entered into between various employer associations and the Los Angeles County District Council of Carpenters ("District Council"), of which Local 1497 was a member. App. 61, P 11(a).
 
 
 10
 By its terms, the 1972 agreement between Schriver and the Trades Council was to remain in effect for one year, with automatic yearly renewals thereafter subject to proper notice of cancellation by either party. Schriver has never served the requisite notice of cancellation upon the Trades Council, and at all material times has been signatory to the above contract. App. 61, P 11(b)-(c). At no time have the employees of Schriver specifically designated the Trades Council or any of its affiliated unions as their collective bargaining representative. App. 61, P 11(d).
 
 
 11
 The parties in the instant dispute appear to be in agreement that the 1972 contract was a "prehire agreement" and that such agreements are recognized by § 8(f) of the National Labor Relations Act.[4] The parties disagree, however, with respect to the legality of certain terms included within the 1972 contract. One such clause is Article IV of the 1972 agreement between Schriver and the Trades Council, which contained the following subcontracting provision:
 
 
 12
 The Employer, Developer and/or Owner-Builder agrees that he shall contract or subcontract all jobsite work set forth in Article I above to a person, firm, partnership or corporation that is party to an executed, current Agreement with the appropriate Union having work and territorial jurisdiction, affiliated with the Council in which area the work is performed.
 
 
 13
 App. 61, P 12. Another such clause is Article I, section 103 of the MLA, incorporated by reference into the 1972 contract, which provided:
 
 
 14
 The Contractor agrees that he or any of his subcontractors on the jobsite will not contract or subcontract work to be done at the site of construction, alteration, painting or repair of a building, structure, or other work, except to a person, firm or corporation, party to an appropriate, current labor agreement with the appropriate union, or subordinate body, affiliated with the Building and Construction Trades Department, AFL-CIO, or with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, or an affiliate thereof.
 
 
 15
 App. 60, P 10.
 
 
 16
 The parties stipulated that the provisions of the MLA applied at any time and at any jobsite where work within the jurisdiction of the unions was performed, regardless of whether or not any union members were present at that jobsite. App. 87, P 85. The contractor thus could not avoid the applicability of the subcontracting clause by using only nonunion labor.
 
 
 17
 In addition to the disputed subcontracting clauses, the parties also disagree as to the legality of Article III, section 306 of the MLA, which authorized the union to take "any" action to enforce awards or resolutions obtained through the grievance and arbitration process. Section 306 provided that:
 
 
 18
 Nothing contained in this Agreement, or any part thereof, shall affect or apply to the Union in any action it may take against any Contractor or subcontractor who has failed, neglected or refused to comply with or execute any settlement or decision reached at any step of the grievance procedure or through Arbitration under the terms of Article V hereof....
 
 
 19
 App. 60, P 10.
 
 
 20
 After signing the 1972 agreement, Schriver did not employ union carpenters, and did not require the subcontractors on its jobsites to be union subcontractors. App. 62, P 16. Although Schriver completed several large and small construction projects from 1972 to May of 1975, at no time did any union representative protest to Schriver's management the failure to abide by the agreement. There was no evidence, however, that the unions had notice of such projects. App. 63, P 19.
 
 
 21
 In May of 1975, Schriver was engaged in the construction of a townhouse project in Montebello, California. On that project Schriver employed carpenters who performed work within the craft jurisdiction of Local 1497, but who were neither members of, nor represented by, Local 1497. App. 63, P 20. On the Montebello townhouse project, Schriver contracted with several subcontractors, approximately 30 percent of which were not signatories to contracts with appropriate labor organizations. At certain times some crafts worked alone on the project; at other times several crafts worked on the project simultaneously. App. 63, P 21.
 
 
 22
 On May 22, 1975, Jim Sogoian, a business representative of Local 1497, approached Schriver's superintendent on the townhouse project. Sogoian asked whether the carpenters on the job were "union," and was told that they were not. Sogoian informed the superintendent that Local 1497 would picket the jobsite if Schriver did not sign the carpenters' agreement. App. 66, P 22. That agreement included the standard subcontracting clauses referred to above.
 
 
 23
 Subsequently, negotiations were conducted between the union and Schriver over the employment of carpenters at the Montebello site. Management officials at Schriver were told by union representatives that the contractor was legally bound by the 1972 agreement with the Trades Council to sign the carpenters' contract. Donald Schriver, president of Schriver, Inc., attempted to obtain different terms to the contract, but the union representatives insisted that Schriver sign the standard carpenters' agreement. Union officials again threatened to picket if Schriver did not sign the contract. App. 66, P 25.
 
 
 24
 On May 28, 1975, the Trades Council sent the following telegram to Schriver:
 
 
 25
 YOU SUBCONTRACTED CARPENTRY WORK TO CONTRACTORS WHO DO NOT HAVE AN EXECUTED AGREEMENT WITH ANY UNION AFFILIATED WITH THE COUNCIL. THIS ACTION ON YOUR PART VIOLATES ARTICLE IV OF YOUR AGREEMENT WITH THE COUNCIL DATED JUNE 12, 1972. UNLESS THE ABOVE-MENTIONED CONTRACTORS ARE IMMEDIATELY REMOVED FROM THE JOB, WE HAVE BEEN AUTHORIZED TO SUE YOU FOR AN INJUNCTION AND DAMAGES.
 
 
 26
 App. 67, P 26. Despite warning, Council officials did not bring suit to enforce the 1972 agreement, and they did not cause any persons to engage in any picketing against Schriver. Id. Nevertheless, unfair labor practice charges were filed on the basis of the threats of picketing.
 
 
 27
 B. The Facts Involving Topaz Contracting and Development Co., Inc.
 
 
 28
 Topaz Contracting and Development Co., Inc. is a California corporation engaged as a framing and carpentry contractor and general developer in the building and construction industry in southern California. App. 58, P 8(a). Topaz falls within the territorial jurisdiction of Local 1752, United Brotherhood of Carpenters and Joiners of America ("Local 1752"). On February 21, 1977, Topaz began carpentry work on a townhouse project in Claremont, California. App. 67, P 27. All crafts on the project were "union" except for the workers employed by Topaz. App. 74, P 45. Topaz has never been a party to any labor agreement with any labor organization. App. 69, P 34.
 
 
 29
 Soon after Topaz began work on the Claremont project, Larry Ruiz, a business representative of Local 1752, spoke to a construction foreman for Topaz and asked him why Topaz was not signed up with the union. Ruiz stated that the union would have to picket if Topaz did not sign a contract. App. 67, P 28. Since Local 1752 was not the designated bargaining representative for the workers employed by Topaz, it sought to enter into a § 8(f) prehire agreement with Topaz.
 
 
 30
 Following the inquiry by Ruiz, Mike Sullivan, a labor relations consultant for Topaz, arrived at the Claremont jobsite and asked Ruiz what contract Topaz had to sign. Ruiz responded that Topaz had to sign the regular carpenters' contract of the Master Labor Agreement. That contract contained the standard subcontracting clauses set forth above. Sullivan told Ruiz that the proposed contract was illegal but that the contractor would be willing to sign the contract for the Claremont jobsite only. However, Ruiz replied that he could not sign any contract other than the Master Labor Agreement. App. 67, P 29.
 
 
 31
 In support of the contract demands, Local 1752 and the District Council picketed the Claremont project for a period of 10 days. The placards read as follows:
 
 
 32
 Topaz Contracting & Dev.
 
 UNFAIR
 
 33
 to
 
 Carpenters
 Local 1752
 Affiliated with the
 
 34
 Los Angeles Building and Construction Trades Council
 
 No Agreement
 
 35
 App. 68, P 31. At this point, unfair labor practice charges were filed by the contractor.
 
 C. Proceedings Before the Board
 
 36
 As shown above, the facts indicated that both Schriver and Topaz employed nonunion carpenters to perform work on construction sites. The facts also revealed that the unions, although not the designated representatives of either contractor's employees, pressured the contractors to agree to the terms and conditions of the Master Labor Agreement. In the case of Schriver, the unions threatened to picket the construction site if Schriver did not sign a current contract. In the case of Topaz, the unions picketed the construction site for 10 days with the object of requiring Topaz to sign the Master Labor Agreement for the first time.
 
 
 37
 The contracts that the unions sought to have executed by both Schriver and Topaz included broad subcontracting clauses, which prohibited the subcontracting of jobsite work to contractors who were not signatories to current agreements with particular unions having jurisdiction over the work. The agreements also contained provisions permitting the unions to take "any" action if the employer failed to comply with any settlement or decision reached pursuant to the terms of the contractual grievance and arbitration procedure.
 
 
 38
 In filing unfair labor practice charges against the unions, the contractors contended that the pressure exerted by the unions to secure the agreements was unlawful because the subcontracting clauses contained in those agreements violated § 8(e) of the National Labor Relations Act.[5] The employers asserted two separate grounds upon which they claimed the clauses violated § 8(e). First, the employers contended that the subcontracting restrictions were not protected by the construction industry proviso to § 8(e) because the clauses were not sought in the context of a collective bargaining relationship as required by the decision in Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). Second, the contractors claimed that the clauses were not protected by the proviso because the restrictions were "overbroad."
 
 
 39
 The clauses were alleged to be overbroad on several grounds. Primarily, the employers argued that subcontracting agreements in the construction industry may only serve to prohibit the subcontracting of work to nonunion subcontractors at particular jobsites where members of the signatory union are actually employed. Thus, the employers claimed that the subcontracting clauses in the MLA were overbroad because not required to be renegotiated on a jobsite by jobsite basis, or at least limited in application to particular jobsites at which members of the signatory union were present. In addition, the employers argued that the subcontracting clauses were overbroad because they required subcontractors to be signatory to contracts with particular unions.
 
 
 40
 In a series of companion cases, the Board rejected each of these arguments.[6] The Board held that, standing alone, the subcontracting agreements were protected by the construction industry proviso to § 8(e). The Board also held, however, that these otherwise lawful provisions lost the protection of the proviso to § 8(e) because of section 306 of Article III of the MLA, which the Board believed authorized the unions to resort to economic action to enforce the subcontracting restrictions.[7] Accordingly, in both the Schriver and Topaz cases, the Board ordered the unions to cease and desist from coercing or restraining the employers where the object thereof is forcing or requiring the employers to enter into subcontracting agreements which are prohibited by § 8(e) by reason of the self-enforcement provisions.
 
 
 41
 Two separate appeals are thus consolidated in this court. In No. 78-2177, the employers and various amici seek pursuant to § 10(f) of the Act to review the Board decision that the subcontracting clauses themselves do not violate § 8(e).[8] In No. 79-1001, the Board seeks enforcement of its order that the unions cease and desist from attempting to secure the subcontracting clauses in conjunction with self-enforcement provisions. The unions were given leave to intervene in No. 78-2177, and the contractors were given leave to intervene in No. 79-1001.
 
 
 42
 II. STATUTORY FRAMEWORK AND THE SUPREME COURT DECISION IN CONNELL
 
 
 43
 In a complex case such as the present one, it is helpful at the outset to set forth clearly the governing statutory framework of the National Labor Relations Act. In addition, the applicable provisions of that Act must be considered in light of the Supreme Court decision in Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), which has some bearing on the resolution of the issues in this case.
 
 A. Statutory Framework
 
 44
 Several provisions of the NLRA bear on this case. Primarily, this case considers the construction of, and relationship between, § 8(b)(4), § 8(e) and § 8(f) of the Act.
 
 
 45
 Section 8(f) of the Act provides that it shall not be an unfair labor practice for unions and employers in the construction industry to enter into collective agreements (known as "prehire agreements") even though the employees of that employer have not designated the union as their lawful bargaining representative.[9] In the case of such a "prehire" agreement, however, the employer or his employees may repudiate the contract at any time.[10] NLRB v. Local 103, International Association of Bridge, Structural & Ornamental Iron Workers (Iron Workers), 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). As a result, it has been held that a union may not picket to enforce an § 8(f) agreement. Id.
 
 
 46
 Unions are also limited in their ability to coerce employers to enter § 8(f) agreements. If an employer currently employs workers who could vote in a representational election, any recognitional or organizational picketing that exceeds 30 days may be found to violate § 8(b)(7) of the Act. See Sears, Roebuck & Co. v. San Diego County District Council of Carpenters, 436 U.S. 180, 186, 98 S.Ct. 1745, 1751, 56 L.Ed.2d 209 (1978); NLRB v. Local 542, International Union of Operating Engineers, 331 F.2d 99 (3d Cir.), cert. denied, 379 U.S. 889, 85 S.Ct. 161, 13 L.Ed.2d 93 (1964). In the present case, the unfair labor practice complaint did not allege a violation of § 8(b)(7). Thus, the recognitional picketing of Topaz for 10 days to secure the § 8(f) agreement was not found by the Board to violate any proscription of § 8(b)(7).[11]
 
 
 47
 More restrictive provisions on picketing come into play, however, if the agreement sought contains provisions that are prohibited by the Act. Fundamental to this case is the § 8(e) ban on so-called "hot cargo" or secondary subcontracting agreements between employers and unions.[12] Although the line between primary and secondary agreements is often difficult to draw, an agreement is generally secondary, and thus prohibited by § 8(e), if it requires an employer to boycott the products or services of other parties with an aim of influencing the labor relations policies of those parties.[13] In the present case, the Board held, and it is not here contested, that the subcontracting clauses contained in the MLA were secondary in nature and within the general prohibition of § 8(e). See 239 N.L.R.B. 264 at 267. If an agreement is prohibited by § 8(e), § 8(b)(4)(A) of the Act prohibits any picketing or threats of picketing aimed at coercing an employer to enter the agreement.[14]
 
 
 48
 Section 8(e), however, also contains a "construction industry proviso" that permits certain secondary agreements in the construction industry. In particular, the proviso allows an agreement between a union and an employer engaged in the construction industry "relating to the contracting or subcontracting of work to be done at the site of the construction." 29 U.S.C. § 158(e). If an agreement is within the proviso to § 8(e), the total ban on picketing to secure the agreement contained in § 8(b)(4)(A) is not applicable.[15]
 
 
 49
 Certain limitations do exist on picketing to obtain a lawful § 8(e) agreement. As developed below, the applicable restrictions of § 8(b)(7) remain. Dallas Building and Construction Trades Council v. NLRB, 396 F.2d 677 (D.C. Cir. 1968). In addition, § 8(b)(4)(B)[16] prohibits a union from picketing to enforce an § 8(e) agreement, or from picketing to coerce a neutral contractor from doing business with an already existing and identified nonunion subcontractor. Orange Belt District Council of Painters No. 48 v. NLRB, 328 F.2d 534, 537 (D.C. Cir. 1964). In the present case, however, the unfair labor practice complaint did not allege any violation of § 8(b)(4)(B).[17]
 
 
 50
 The question presented by this case, therefore, is whether the § 8(f) agreements sought by the unions violated § 8(e). That question turns on whether or not the subcontracting clauses contained in those agreements are within the protection of the construction industry proviso to § 8(e). If, but only if, the agreements are not protected by that proviso, the picketing and threats of picketing to secure the agreements violated § 8(b)(4)(A).
 
 B. The Supreme Court Decision in Connell
 
 51
 In Connell Construction Co. v. Plumbers & Steamfitters Local 100, 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975), the Supreme Court considered at length the construction industry proviso to § 8(e). Since certain of the language in Connell forms the basis for the employers' contentions here, we are constrained to consider the applicability of the holdings in Connell to the instant cases.
 
 
 52
 To understand fully the Supreme Court decision in Connell, it is essential to view the case in its proper historical context. Connell represented another chapter in the struggle between trade unions and general contractors in the construction industry in Dallas, and arose in response to the decision of this court in Dallas Building and Construction Trades Council v. NLRB, 396 F.2d 677 (D.C.Cir.1968). See Connell Construction Co. v. Plumbers & Steamfitters Local 100, 483 F.2d 1154, 1157-58 (5th Cir. 1973).
 
 
 53
 In Dallas Building and Construction Trades Council, a trade union council in the Dallas area sought an agreement with a construction employers' association that would restrict subcontracting to employers signatory to agreements with appropriate local craft unions. The trades council was not the authorized bargaining agent of any contractors' employees, and disavowed any intention to become a bargaining representative. Upon the refusal of the employer association to sign the subcontracting agreement, the trades council served a similar demand on four specific contractors. When these contractors also refused to sign the agreement, the trades council picketed several of their jobsites. 396 F.2d at 678-79.
 
 
 54
 The picketed contractors filed unfair labor practice charges against the trades council. Upon considering the case, the NLRB found that the trades council had violated § 8(b)(7) by picketing with a recognitional object at a time when no question of representation could be raised due to contract-bar rules.[18] Both the Board and this court found the council's mere disclaimer of intention to seek recognition to be "unavailing." 396 F.2d at 681. Since the trades council had jurisdiction over employees who would be affected by the subcontracting agreement and sought a continuing contractual relationship with their employers, the trades council would necessarily be the "representative" of the employees with respect to the subject matter of the agreement. Id. at 683.[19]
 
 
 55
 The trades council had primarily contended that the subcontracting agreement was protected by the construction industry proviso to § 8(e), and that Congress could not have intended to limit so severely picketing to achieve such agreements. This court rejected the council's argument, and held that § 8(b) (7) and § 8(e) are aimed at wholly different problems. The court held that even though an agreement is lawful under § 8(e), and picketing to secure the agreement is not prohibited by § 8(b)(4)(A), the picketing may be prohibited by § 8(b)(7) if it has an object that is recognitional. 396 F.2d at 682.
 
 
 56
 In rejecting the council's argument, this court distinguished several cases, relied on by the trades council, that had held that picketing had not violated § 8(b)(7) because it was not "recognitional." The court stressed that those cases were "clearly distinguishable" because the labor organizations had sought no contractual ties or continuing relationship with the employers, and because "the subcontracted work was not also performed by the general contractor's own employees." 396 F.2d at 683. The court also noted that the Board had expressly ruled that picketing to secure subcontracting agreements could not violate § 8(b)(7) if the coverage of the proposed contract was limited to the type of work that was never performed by the general contractor's own employees. Id. at 682 n.8. In these situations, a union by definition could not be deemed to have a recognitional object, since the agreement would not affect any workers the union could represent.
 
 
 57
 It was in the aftermath of this decision that the events leading to Connell occurred. In Connell, the union once again sought a subcontracting agreement from a Dallas contractor. Upon failing to obtain the agreement, the union picketed and caused a massive walkout on the jobsite. The contractor eventually signed the agreement under protest, and then brought suit in federal court claiming a violation of federal and state antitrust laws. The union defended on the ground that the agreement was authorized by the construction industry proviso to § 8(e). See Connell Construction Co. v. Plumbers & Steamfitters Local 100, 483 F.2d 1154, 1156-57 (5th Cir. 1973).
 
 
 58
 In Connell, the union sought the subcontracting agreement from an employer who did not employ any workers within the jurisdiction of the union at the time of the demand to contract and the picketing.[20] The sole objective of the union was to enter into an agreement with the contractor by which all work within the union's jurisdiction would be subcontracted to firms who were signatory to a collective bargaining agreement with the union. Since the contractor had no employees within the jurisdiction of the union, the union could not be charged with any recognitional objective. 483 F.2d at 1157.
 
 
 59
 In this way, the union in Connell sought to avoid the reach of Dallas Building and Construction Trades Council and § 8(b)(7). Since there was no recognitional objective to the picketing, the picketing could not violate § 8(b)(7). Since the subcontracting clause appeared to be protected by the construction industry proviso to § 8(e), the picketing could not violate § 8(b) (4)(A). Thus, the union appeared to have found a means by which it could apply unlimited pressure upon contractors to subcontract only with firms who were signatory to agreements with the union. However, the Supreme Court disagreed and ruled that the agreement was subject to federal antitrust laws. The Court thus remanded the case for a determination of whether the agreement restrained trade within the meaning of the Sherman Act. 421 U.S. at 637, 95 S.Ct. at 1842.
 
 
 60
 The Supreme Court recognized in Connell that the literal language of the construction industry proviso to § 8(e) was broad and that the disputed subcontracting clauses fell within the letter of the statute. The Court added, however, that " § 8(e) must be interpreted in light of the statutory setting and the circumstances surrounding its enactment," and proceeded to consider the intention and purpose of the statute. 421 U.S. at 628, 95 S.Ct. at 1837. The Court noted that "the construction-industry proviso was explained only by bare references to 'the pattern of collective bargaining' in the industry." Id. The Court described several policies that may have motivated this special exception contained in § 8(e). The decision in Connell suggests that one purpose of the enactment of the proviso to § 8(e) may have been an attempt by Congress to overrule NLRB v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 934, 95 L.Ed. 1284 (1951), where the Supreme Court had ruled that a labor organization committed an unfair labor practice by picketing a construction site with an object of forcing the general contractor to terminate its contract with a nonunion subcontractor. The decision in Connell also recognizes that another purpose of the proviso may have been to allow secondary agreements pertaining to activity on a construction jobsite "because of the close community of interests there," National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 638-39, 87 S.Ct. 1250, 1265, 18 L.Ed.2d 357 (1967), or, even more narrowly, "to alleviate the frictions that may arise when union men work continuously alongside nonunion men on the same construction site," Drivers Local 695 v. NLRB, 361 F.2d 547, 553 (D.C.Cir.1966). See 421 U.S. at 630, 95 S.Ct. at 1838. The Supreme Court was not called upon to choose between these possibilities, however, because the union conduct in Connell was not related to any of the above policies. Id. at 631, 95 S.Ct. at 1839.
 
 
 61
 Nevertheless, there is one point in Connell that is clear. That point is that one of the major aims of the 1959 amendments to the NLRA, of which § 8(e) was one, was to limit "top-down" organizing campaigns. Id. at 632, 95 S.Ct. at 1839. The Court noted changes made by Congress in 1959 to limit the ability of a union to utilize such pressure to obtain recognition. Id. It was also clear to the Court in Connell that this attempt to limit "top-down" organizing would be seriously undermined if the proviso to § 8(e) was construed to authorize the subcontracting agreement sought in Connell. As described above, if the agreements were indeed protected by the proviso, the union would have an unlimited ability to pressure contractors to deal only with subcontractors who were signatory to agreements with the union, as long as that contractor employed no workers within the union's jurisdiction.
 
 
 62
 The Supreme Court concluded, therefore, that "absent a clear indication that Congress intended to leave such a glaring loophole in its restrictions on 'top-down' organizing," the construction industry proviso should not be construed to authorize the subcontracting agreement in Connell. Id. at 633, 95 S.Ct. at 1840. Instead, the Court concluded that the protection of the proviso to § 8(e) "extends only to agreements in the context of collective-bargaining relationships and, in light of congressional references to the Denver Building Trades problem, possibly to common situs relationships on particular jobsites as well." Id. Since the union in Connell had no interest in representing Connell's employees, the subcontracting agreements were held not to be within the protection of the proviso to § 8(e).
 
 
 63
 III. SUFFICIENCY OF A § 8(f) RELATIONSHIP TO SATISFY CONNELL
 
 
 64
 As developed above, the Supreme Court in Connell held that the protection of the proviso to § 8(e) extends only to subcontracting agreements sought "in the context of collective-bargaining relationships." 421 U.S. at 633, 95 S.Ct. at 1840. In the present case, the unions were not the designated bargaining representative of a majority of either Schriver's or Topaz' employees and the subcontracting agreements were not sought in the context of a standard § 9(a) organizational campaign or collective bargaining relationship. Instead, the agreements were sought as part of a § 8(f) prehire agreement between the unions and the employer-contractors. The employers' first argument to this court is that a § 8(f) relationship is not sufficient to satisfy the "collective-bargaining relationship" requirement of Connell.
 
 
 65
 The Board in the present case held that the test set forth in Connell is satisfied whenever a union seeks a complete contractual relationship with an employer, establishing wages, hours, and other terms and conditions of employment; to satisfy Connell, it is irrelevant that the contract is merely a "prehire agreement" authorized by § 8(f) and the union lacks established majority status. 239 N.L.R.B. 264 at 268. We fully agree with this conclusion of the Board. Since § 8(f) provides the very means by which unions and employers typically initiate a bargaining relationship in the construction industry, we reject the employers' argument that an § 8(f) relationship is insufficient to satisfy the collective bargaining requirement of Connell.
 
 
 66
 Fundamentally, it is clear that Connell itself does not mandate the employers' position. It must be remembered that in Connell, the union expressly disclaimed all recognitional intent and sought a restrictive subcontracting agreement from a contractor whose employees it could not represent (a so-called "stranger contractor"). The only term of the agreement that the union sought in Connell was a promise that the employer would subcontract work only to firms signatory to a current collective bargaining agreement with the union. The Supreme Court was thus faced with a situation involving a union that had successfully bypassed the strictures of Dallas Building and Construction Trades Council and the reach of § 8(b)(7), and had appeared to secure an unlimited weapon by which it could apply organizational pressure on other contractors.
 
 
 67
 The present case bears absolutely no resemblance to Connell. Rather than disclaim a recognitional object, the unions in the present case explicitly sought to secure representation of Schriver's and Topaz' employees. The unions sought to enter into a complete agreement with the contractors, covering the wages, benefits, and other conditions of employment of the contractors' own employees. Their primary goal was not to apply organizational pressure on other firms, but to standardize the working conditions of the employees of these contractors.[21] The unions simply attempted to do so in the context of an § 8(f) prehire agreement, the standard means of initiating collective bargaining in the construction industry.[22]
 
 
 68
 As a result of this critical factual distinction between Connell and the present case, the overriding concern of the Supreme Court in Connell is entirely inapplicable here. The Supreme Court holding in Connell was based on the fear that the careful limits established by Congress to restrain the ability of unions to organize from the "top-down" would be "undermined seriously" if the proviso to § 8(e) was construed to allow unions to seek subcontracting agreements from contractors with which it had no bargaining relationship. 421 U.S. at 633, 95 S.Ct. at 1840. Since the lack of recognitional intent removed the union in Connell from the reach of § 8(b)(7), the Court's concern was clearly justified.
 
 
 69
 That rationale is simply not available in the present case, however. As established by this court in Dallas Building and Construction Trades Council, the recognitional object evidenced by the agreement sought in the present case clearly subjects the unions to the stringent limitations of § 8(b)(7). The unions do not have an unlimited ability to apply recognitional pressure on other contractors, as the union would have had in Connell had the Supreme Court extended the protection of § 8(e) to agreements with "stranger" contractors.
 
 
 70
 The legislative history of § 8(f) strongly supports the position that an 8(f) agreement occurs "in the context of collective-bargaining" in the construction industry. Section § 8(f) was enacted as part of the 1959 amendments to the National Labor Relations Act. The provision was added due to the peculiar nature of employment in the building and construction industry. As described in the Senate Report concerning § 8(f):
 
 
 71
 The occasional nature of the employment relationship makes this industry markedly different from manufacturing and other types of enterprise. An individual employee typically works for many employers and for none of them continuously. Jobs are frequently of short duration, depending on various stages of construction.
 
 
 72
 S.Rep.No.187, 86th Cong., 1st Sess. 27 (1959), U.S.Code Cong. & Admin.News 1959, pp. 2318, 2344, reprinted in I Legislative History of the Labor-Management Reporting and Disclosure Act of 1959 (Legislative History), at 423 (1959). As a result of these peculiarities, special arrangements became common in the construction industry. As described by the Senate Report:
 
 
 73
 In the building and construction industry it is customary for employers to enter into collective bargaining agreements for periods of time running into the future, perhaps 1 year or in many instances as much as 3 years. Since the vast majority of building projects are of relatively short duration, such labor agreements necessarily apply to jobs which have not been started and may not even be contemplated.
 
 
 74
 Id. at 28, U.S.Code Cong. & Admin.News 1959, p. 2344; I Legislative History at 424. The Report noted that these agreements have special advantages for employers as well as workers:
 
 
 75
 One reason for this practice is that it is necessary for the employer to know his labor costs before making the estimate upon which his bid will be based. A second reason is that the employer must be able to have available a supply of skilled craftsmen ready for quick referral.
 
 Id.[23]
 
 76
 For these reasons and since the practice of signing such agreements was "not entirely consistent with Wagner Act rulings of the NLRB that exclusive bargaining contracts can lawfully be concluded only if the union makes its agreement after a representative number of employees have been hired," id., Congress added § 8(f) to the Act. That provision authorizes employers in the construction industry to enter into comprehensive agreements with labor organizations that have not established majority status in the manner provided by § 9 of the Act. As the Senate Report bluntly concluded, "(r)epresentation elections in a large segment of the industry are not feasible to demonstrate such majority status due to the short periods of actual employment by specific employers." Id. at 55, U.S.Code Cong. & Admin.News 1959, p. 2373; I Legislative History at 451 (emphasis supplied).
 
 
 77
 Congress thus expressly recognized that § 9(a) collective bargaining relationships are often not feasible in the construction industry. Due to the occasional nature of employment in that industry, unions and employers may enter "prehire" agreements that stabilize employment conditions in a particular geographic area over an extended period of time. It would make little sense to conclude that this necessary and most common type of collective bargaining relationship in the construction industry, specifically recognized and authorized by Congress, is not a "collective-bargaining relationship" as that term is used in Connell.
 
 
 78
 There is nothing in the legislative history to suggest that prehire agreements are limited to certain terms and conditions of employment, and may not include others. The same Congress that adopted § 8(f) in 1959 added to the newly enacted § 8(e) a proviso that expressly authorizes subcontracting agreements in the construction industry. There is no reason why Congress would protect subcontracting agreements in the construction industry under § 8(e), and at the same time prohibit the most common and possibly the only effective means by which such an agreement may be obtained. We hold, therefore, that a subcontracting agreement sought in the context of an § 8(f) prehire agreement does not violate § 8(e).
 
 
 79
 It is true that an § 8(f) agreement is not identical in all respects to a standard § 9(a) collective bargaining agreement. An § 8(f) agreement is not protected by traditional contract-bar rules, and the Supreme Court has recently held that a union violates § 8(b)(7) if it engages in extended picketing to enforce a prehire agreement with an employer. NLRB v. Local 103, International Association of Bridge, Structural & Ornamental Iron Workers, 434 U.S. 335, 98 S.Ct. 651, 54 L.Ed.2d 586 (1978). As also stated by the Supreme Court in Iron Workers :
 
 
 80
 The employer's duty to bargain and honor the contract is contingent on the union's attaining majority support at the various construction sites.
 
 
 81
 434 U.S. at 345, 98 S.Ct. at 658. The Court further noted an earlier statement of the Board that a "prehire agreement is merely a preliminary step that contemplates further action for the development of a full bargaining relationship." Id.; Ruttmann Construction Co., 191 N.L.R.B. 701, 702 (1971). These considerations certainly diminish the force and effect of an § 8(f) agreement. They are irrelevant to our conclusion, however, that a subcontracting provision sought in the context of an § 8(f) prehire agreement occurs "in the context of collective-bargaining" as required by Connell.
 
 
 82
 The requirement in Connell that there be a collective bargaining relationship only has meaning within its own context. Connell required a collective bargaining relationship to guarantee that a union seeking a subcontracting agreement could not sidestep § 8(b)(7) and apply unlimited secondary pressure on nonunion subcontractors. An attempt by a union to establish an § 8(f) relationship is sufficient to satisfy that concern; a union seeking an § 8(f) agreement covering wages and other terms of employment remains subject to the restrictions of § 8(b)(7). Dallas Building and Construction Trades Council v. NLRB, 396 F.2d 677 (D.C.Cir.1968). Whether an § 8(f) relationship is otherwise deemed to be a "collective-bargaining relationship" is a question totally academic to this case, missing the entire purpose and thrust of Connell.
 
 
 83
 Even though a prehire agreement is merely a preliminary step towards the development of a full bargaining relationship, Congress recognized in 1959 that it was most often an indispensable step. As quoted above from the Senate Report, representative elections leading up to a traditional collective bargaining relationship generally "are not feasible" in the construction industry. Senate Report, supra, at 55, U.S.Code Cong. & Admin.News 1959, p. 2373; I Legislative History at 451. The Supreme Court in Iron Workers also recognized the value of a prehire agreement, despite its limited enforcement capability:
 
 
 84
 Neither has the Board challenged the voluntary observance of otherwise valid § 8(f) contracts, which is the normal course of events. It is also undisputed that when the union successfully seeks majority support, the prehire agreement attains the status of a collective-bargaining agreement executed by the employer with a union representing a majority of the employees in the unit.
 
 
 85
 434 U.S. at 349-50, 98 S.Ct. at 660 (emphasis supplied).
 
 
 86
 Thus, the ability to enforce an § 8(f) agreement has nothing to do with the lawfulness of a subcontracting agreement contained within the § 8(f) contract. Indeed, describing § 8(f) agreements, the Supreme Court in Iron Workers noted that "a comparable situation" exists concerning hot cargo clauses, "which are permitted in the construction industry by § 8(e), 29 U.S.C. § 158(e), but which cannot be enforced by picketing." 434 U.S. at 349 n.11, 98 S.Ct. at 659 n.11 (emphasis supplied).
 
 
 87
 It may be that the employers' real complaint in the present case is their belief that § 8(b)(7) itself is insufficient to counter "top-down" organizational pressure in the construction industry.[24] It is not for this court, however, to rewrite the careful statutory scheme established by Congress. Due to the applicability of § 8(b)(7), the unions in the present case do not have the unlimited right to apply secondary pressure of the sort that triggered the Supreme Court decision in Connell. If the present restrictions of § 8(b)(7) are inadequate to deal with problems arising during union organizational drives, then further change must come from Congress, not from this court.
 
 
 88
 The subcontracting agreements in the present case were sought in the context of a collective bargaining relationship. They do not violate § 8(e) by reason of their inclusion in an § 8(f) prehire agreement.
 
 
 89
 IV. THE SCOPE OF THE CONSTRUCTION INDUSTRY PROVISO TO § 8(e)
 
 
 90
 The employers' second major argument on appeal is that the subcontracting agreements sought in the present case are beyond the permissible "scope" of the construction industry proviso to § 8(e). The parties stipulated that the subcontracting clauses applied "at anytime and any construction jobsite within the definition of the construction proviso to Section 8(e) of the NLRA, as amended, where work within the jurisdiction of Respondents is being performed, regardless of whether or not members of Respondents are present at any given time at any given site." App. 87, P 85.
 
 
 91
 The employers primarily claim that the agreements are overbroad because the subcontracting clauses need not be renegotiated on a jobsite by jobsite basis after it is determined that workers of the signatory union will be present on that jobsite. Alternatively, the employers argue that the clauses at least should be limited in application to those present and future jobsites where signatory union workers actually will be employed. In addition, the employers claim that the agreements are overbroad because the subcontracting clauses require subcontractors to be signatory to contracts with particular labor organizations.
 
 
 92
 A. Limitation With Respect to Particular Jobsites
 
 
 93
 The employers find support for their principal claim in Connell, where the Supreme Court considered briefly the purposes of the construction industry proviso to § 8(e). The decision in Connell noted that the Supreme Court had previously interpreted the proviso as a measure designed to allow subcontracting agreements "because of the close community of interests" on the construction site, and that other courts had suggested even more narrowly that the purpose of the proviso was "to alleviate the frictions that may arise when union men work continuously alongside nonunion men on the same construction site." See 421 U.S. at 630, 95 S.Ct. at 1838, and cases cited.
 
 
 94
 In addition, the employers' argument was recently accepted by a panel of the Ninth Circuit in Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB, 609 F.2d 1341 (9th Cir. 1979), rehearing en banc granted, No. 78-3469 (9th Cir. Aug. 19, 1980). In Pacific Northwest, the court held that the construction industry proviso extends shelter "only when the employer or his subcontractor has employees who are members of the signatory union at work at some time at the jobsite at which the employer wishes to engage a nonunion subcontractor." 609 F.2d at 1347. In other words, the Ninth Circuit panel decision would limit the protection of the proviso to subcontracting agreements in which the employer promised not to put signatory union workers and other nonunion workers on the same jobsite. Under such an interpretation of § 8(e), an employer could completely circumvent the subcontracting agreement by simply keeping all union workers off the job.
 
 
 95
 The Board argues that this narrow interpretation of the purpose and scope of the proviso is incorrect and should not be adopted by this court. In particular, the Board argues that the purpose of the construction industry proviso is not limited to insulating signatory union workers from having to work on particular jobsites alongside nonunion workers; the Board also contends that § 8(e) protects subcontracting agreements in the construction industry in order to protect continuity of work and benefits for employees, a goal made difficult by the nature of employment in that industry. The Board thus urges that the subcontracting clauses in the present case do not fall outside the scope of the proviso to § 8(e).
 
 
 96
 We believe that the interpretation of the Board is consistent with the intent of Congress in enacting the construction industry proviso to § 8(e). Accordingly, we refuse to adopt the narrow interpretation of the proviso adopted by the panel decision of the Ninth Circuit in Pacific Northwest.
 
 
 97
 At the outset, we note that the proviso itself to § 8(e) contains no limitation such as that proposed by the employers in this case. Instead, the proviso broadly authorizes agreements in the construction industry "relating to the contracting or subcontracting of work to be done at the site of the construction." § 8(e), 29 U.S.C. § 158(e). The agreements in the present case thus plainly fall within the literal protection of the statute. We recognize, however, as the Supreme Court stated in Connell, that " § 8(e) must be interpreted in light of the statutory setting and the circumstances surrounding its enactment." 421 U.S. at 628, 95 S.Ct. at 1837. We would emphasize, however, that the Supreme Court in Connell did not dispose of the issue before us. The Court in Connell was faced solely with the question whether a subcontracting agreement could be sought outside the context of a collective bargaining relationship. The Court did not consider the scope of the construction industry proviso to § 8(e), the precise question now before us. As recognized by the panel decision in Pacific Northwest :
 
 
 98
 However, since the subcontractor agreement in Connell occurred outside the collective bargaining context altogether, the Court was not required to decide whether and under what circumstances a subcontractor clause contained in a valid labor agreement would receive the protection of the proviso. What Connell left unanswered we must confront and answer.
 
 609 F.2d at 1348.[25]
 
 99
 We turn then to consider the "statutory setting and the circumstances surrounding" the enactment of § 8(e). Before examining the legislative history in detail, however, it will be useful to mention briefly the legislative and case law history preceding the passage of § 8(e). Certain "secondary" activity was forbidden prior to the 1959 amendments to the Act. In particular, § 8(b)(4)(A) of the Act prohibited a union from inducing employees to strike or to refuse to handle goods when an object of such activity was to force an employer to cease doing business with some third party. In the Sand Door case, Local 1976, United Brotherhood of Carpenters v. NLRB, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958), however, the Supreme Court stated that a boycott voluntarily engaged in by an employer did not violate the Act, and that a union could approach an employer to persuade him to engage in such a boycott as long as it refrained from prohibited concerted activity. 357 U.S. at 98-99, 78 S.Ct. at 1015-16.[26]
 
 
 100
 In 1959, Congress moved to close this "loophole" and prohibit such "hot cargo" agreements themselves. See Mullins v. Kaiser Steel Corp., --- F.2d ----, No. 79-1463, slip op. at 20 (D.C.Cir. Sept. 17, 1980); National Woodwork Manufacturers Ass'n v. NLRB, 386 U.S. 612, 634, 87 S.Ct. 1250, 1262, 18 L.Ed.2d 357 (1967). The Senate version of § 8(e) merely would have made it an unfair labor practice for an employer in the trucking industry to agree to boycott the products of any other employer. See H.R.Rep.No.1147, 86th Cong., 1st Sess. (Conference Report) 39 (1959), U.S.Code Cong. & Admin.News 1959, p. 2318; I Legislative History at 943. The House amended the bill to make it an unfair labor practice for any labor organization and any employer to enter into such an agreement. Id. The conference committee adopted the House amendment, but added three provisos, one of which is the construction industry proviso at issue in this case. Id.
 
 
 101
 The Conference Report briefly describes the purpose of the construction industry proviso to § 8(e). After stressing that the proviso extends only to work to be performed at the site of the construction, the Report states:
 
 
 102
 The committee of conference does not intend that this proviso should be construed so as to change the present state of the law with respect to the validity of this specific type of agreement relating to work to be done at the site of the construction project or to remove the limitations which the present law imposes with respect to such agreements. Picketing to enforce such contracts would be illegal under the Sand Door case (Local 1796 (sic), United Brotherhood of Carpenters v. NLRB, 357 U.S. 93 (78 S.Ct. 1011, 2 L.Ed.2d 1186) (1958)). To the extent that such agreements are legal today under section 8(b) (4) of the National Labor Relations Act, as amended, the proviso would prevent such legality from being affected by section 8(e).
 
 
 103
 Conference Report at 39, U.S.Code Cong. & Admin.News 1959, p. 2511; I Legislative History at 943 (emphasis supplied).
 
 
 104
 Similar remarks were made during subsequent Congressional debate. As Senator John F. Kennedy, chairman of the joint conference, stated on the Senate floor:
 
 
 105
 The Landrum-Griffin bill extended the "hot-cargo" provisions of the Senate bill, which we applied only to Teamsters, to all agreements between an employer and a labor union by which the employer agrees not to do business with another concern. The Senate insisted upon a qualification for the clothing and apparel industries and for agreements relating to work to be done at the site of a construction project. Both changes were necessary to avoid serious damage to the pattern of collective bargaining in these industries.
 
 
 106
 105 Cong.Rec. 17899 (1959); II Legislative History at 1432 (emphasis supplied). See also remarks of Representative Thompson on the House floor, 105 Cong.Rec. 18134 (1959); II Legislative History at 1721.
 
 
 107
 From an examination of the legislative history, therefore, one point alone is clear: the construction industry proviso to § 8(e) was intended to preserve the pattern of collective bargaining in the construction industry as it existed prior to 1959 and the enactment of § 8(e). As indeed recognized by the Supreme Court in Connell :
 
 
 108
 Although the garment-industry proviso was supported by detailed explanations in both Houses, the construction-industry proviso was explained only by bare references to "the pattern of collective bargaining" in the industry.
 
 
 109
 421 U.S. at 628-29, 95 S.Ct. at 1837-38 (footnotes omitted).
 
 
 110
 Unfortunately, as suggested by the Court in Connell, the legislative history does not spell out exactly what "the pattern of collective bargaining" in the industry was prior to 1959, or precisely what serious damage would be afflicted should that pattern be changed. Remarks by Senator Kennedy, however, make clear that Congress believed that subcontracting agreements were lawful in the construction industry prior to 1959:
 
 
 111
 Agreements by which a contractor in the construction industry promises not to subcontract work on a construction site to a nonunion contractor appear to be legal today. They will not be unlawful under section 8(e). The proviso is also applicable to all other agreements involving undertakings not to do work on a construction project site with other contractors or subcontractors regardless of the precise relation between them.
 
 
 112
 105 Cong.Rec. at 17900; II Legislative History at 1433.
 
 
 113
 The employers in this action have not cited a single case in which a subcontracting agreement was found to be unlawful prior to 1959 by reason of the fact that the agreement was not limited to particular jobsites at which signatory union workers were employed. There is absolutely no evidence that such agreements were prohibited prior to 1959, and the legislative history makes clear that if an agreement was lawful in 1959, the construction industry proviso "would prevent such legality from being affected by section 8(e)." Conference Report, supra, at 39, U.S.Code Cong. & Admin.News 1959, p. 2511; I Legislative History at 943.
 
 
 114
 On the other hand, there is evidence that the pattern of collective bargaining in the construction industry in 1959 included subcontracting agreements such as those present in this case. Perhaps most influential is a report published in 1961, containing the results of a study which examined "the prevalence and characteristics of subcontracting provisions in major collective bargaining agreements in effect in 1959, prior to the Taft-Hartley amendments contained in the Labor-Management Reporting and Disclosure Act of 1959." Lunden, Subcontracting Clauses in Major Contracts, 84 Monthly Labor Review 579 (part I), 715 (part II), at 579 (1961).[27]
 
 
 115
 After describing the prevalence of subcontracting agreements in the construction industry, the study noted:
 
 
 116
 The single most frequent requirement, found in more than 50 major contracts, called for the subcontractor to comply with all the terms and conditions of the prime employer's agreement. This provision "blankets in" the subcontractor, no matter what project he works on in the local union's jurisdiction or which prime employer he works for.
 
 
 117
 Id. at 715. Although the report surveys and describes every type of subcontracting agreement used in a major collective bargaining agreement in the construction industry at that time, not one agreement was found to limit the applicability of the subcontracting restriction to particular jobsites at which both union and nonunion workers were employed. Id. at 715-16.
 
 
 118
 In keeping with this fact, the Board has consistently held in cases decided since 1959 that subcontracting agreements need not be limited to particular jobsites. After surveying a series of cases involving subcontracting agreements such as those at issue in this case, the Board in Carpenters Local 944 (Woelke & Romero Framing), 239 N.L.R.B. 241 (1978) concluded:[28]
 
 
 119
 Thus, the Board has upheld clauses, such as those herein, which are not limited to particular existing jobsites or to the duration of particular jobs.
 
 
 120
 239 N.L.R.B. at 248. The Board further noted that:
 
 
 121
 As can be seen from the foregoing cases, as well as others too numerous to cite, the Board, with court approval, has construed the construction industry proviso literally to protect "any agreement" between qualified parties which limits subcontracting of work to be performed at the site of construction to employers who are signatory to a specific union agreement or to an agreement generally with the "appropriate union" (meaning, generally, an affiliate of a building and construction trades council).
 
 
 122
 Id.
 
 
 123
 There are reasons why subcontracting agreements in the construction industry-prior to 1959 as well as today-have not been limited to particular, identified jobsites. As stated in the Lunden study on subcontracting agreements in existence in 1959, supra :
 
 
 124
 In the construction industry, subcontracting is generally accepted by unions and employers as a normal condition of work. Few provisions were found that attempted to preserve job opportunities by creating certain conditions under which management could contract out. For example, only one clause prohibited subcontracting if it would result in layoff, and a very small number required the company to notify the union in advance of subcontracting or to subcontract only after receiving union approval. On the other hand, the protection of contract standards was of major interest. The most common restrictions required the subcontractor to comply with the terms of the prime employer's contract, to have a union agreement of his own, or to employ union labor and use union-made material.
 
 
 125
 84 Monthly Labor Review at 715 (emphasis supplied).
 
 
 126
 In other words, the purpose of subcontracting provisions in the construction industry is not simply to avoid "friction" on the jobsite that may arise when both union and nonunion workers are present. A fundamental purpose of subcontracting agreements is, and always has been, to protect contract standards in the construction industry, a goal that would be unattainable in that industry if subcontracting agreements were not allowed.
 
 
 127
 Understanding the special nature of employment in the construction industry is critical to understanding the special purpose of subcontracting agreements in that industry. Due to the infeasibility of negotiation on a project by project basis, "master" or "prehire" agreements are negotiated with an employer in the construction industry, establishing uniform conditions of employment over an extended period of time and geographic area. Special fringe benefit funds are created. Standing alone, however, such agreements are incapable of protecting the conditions they establish, as a result of an additional facet of employment in the construction industry.
 
 
 128
 In the construction industry, subcontracting is the usual rather than the extraordinary practice. Workers are not typically attached to one employer; rather, workers are organized in employment pools to be hired out either by the contractor with whom they have an agreement or by a subcontractor to whom the work is assigned. The only way that workers in the employment pool may be certain to receive the protection and benefits provided by the master collective bargaining agreement is if subcontracting is limited to subcontractors who are signatory to that agreement, or who provide identical terms.
 
 
 129
 In other words, in most cases it makes little difference to construction workers whether they are employed directly by the contractor with whom they have an agreement or by an assigned subcontractor, as long as the standards of their original employment contract are protected. The fulfillment of that goal is guaranteed by subcontracting agreements such as those at issue here. Thus, the freedom of the contractor signatory to the agreement to either perform work directly or subcontract out is preserved, while at the same time workers are guaranteed that contract standards will be protected in either event.
 
 
 130
 Employees working under a collective bargaining agreement on a construction site have an interest in not being replaced through subcontracting by other workers willing to do the same work without the same compensation or benefits. The special nature of the construction industry, however, forces that interest to be expressed in a special manner. Since their employment will be terminated in any event once a given project is completed, the concern of these employees is not simply that they will be replaced at the particular location at which they are working with nonunion workers. As a result of the temporary and transitory nature of employment in the construction industry, workers are more concerned that the union-represented pool of workers to which they belong will be "replaced" at future projects. Since the employee pool is not attached to a particular employer but to the industry as a whole, workers in the construction industry have no interest in forbidding "contracting-out" altogether, as do their counterparts in the industrial sector. Instead, their interest is in assuring that their collective bargaining agreement is respected on each jobsite upon which their employer works whether he does the work himself or subcontracts it out.
 
 
 131
 It is evident, therefore, that to require subcontracting agreements to be renegotiated on a jobsite by jobsite basis, or limited in application to jobsites where union workers are already present, would completely subvert a primary purpose of subcontracting agreements in the construction industry. This is an extremely important consideration here because, as noted above, the construction industry proviso to § 8(e) was intended to embrace lawful practices in effect in the industry as of 1959.
 
 
 132
 Moreover, it is simply not feasible for employers and unions in the construction industry to renegotiate agreements on each jobsite, a fact recognized by Congress in enacting § 8(f) in 1959. To repeat the words of the Senate Report, labor agreements in the construction industry "necessarily apply to jobs which have not been started and may not even be contemplated." Senate Report, supra, at 28 U.S.Code Cong. & Admin.News 1959, p. 2344; I Legislative History at 424. The position urged upon us by the employers would force unions and employers to negotiate subcontracting agreements on a jobsite by jobsite basis, despite the fact that § 8(f) authorizes collective bargaining agreements in the construction industry without limitation with respect to the employer's current and future jobsites in the area covered by the union's jurisdiction. We believe it to be inconceivable that the same Congress that enacted § 8(f) to accommodate the special characteristics of the construction industry ignored those very same characteristics in enacting the construction industry proviso to § 8(e). Certainly nothing in the legislative history to those sections suggests such a result.
 
 
 133
 Accordingly, we hold that the subcontracting agreements in the present case did not violate § 8(e) by reason of the fact that the clauses did not need to be renegotiated on each individual jobsite, or because the clauses were not limited to particular jobsites at which signatory union workers were already employed.[29]
 
 
 134
 This holding is not contrary to Connell. It is true that it would have been even easier to standardize employment conditions in the construction industry had the Supreme Court in Connell held that subcontracting agreements could be sought outside the context of collective bargaining. The fact that the Supreme Court rejected that outcome, however, does not mandate a similar resolution here.
 
 
 135
 As developed above, the subcontracting agreements in the present case are consistent with the pattern of collective bargaining in the construction industry existing at the time of the 1959 amendments to the NLRA. In contrast, the subcontracting agreement sought in Connell was "a relatively novel organizing tactic in the building trades." St. Antoine, Connell: Antitrust Law at the Expense of Labor Law, 62 Va.L.Rev. 603, 628 (1976). In his dissent from the Fifth Circuit's opinion in Connell, Judge Clark noted that the union in Connell had been unable, in response to a specific request for supplemental briefs, "to point out any source of information which would show that subcontractor contracts such as the one in this case were even occasionally utilized in the industry prior to 1959, much less so common a practice that we could assume Congress intended to preserve that part of the pattern of collective bargaining in the industry." 483 F.2d at 1182.
 
 
 136
 In addition to the lack of evidence showing that the subcontracting provision in Connell was consistent with the pattern of bargaining in the industry, the Supreme Court in Connell was also faced with a union tactic that effectively avoided certain of the clear proscriptions of § 8(b)(4) and § 8(b)(7). Thus, the Court in Connell did not feel bound by the literal language of § 8(e) and, instead, imposed a limitation not expressly included in the statute in order to enforce a clear congressional mandate to restrict "top-down" organizing. 421 U.S. at 628, 633, 95 S.Ct. at 1837, 1840.
 
 
 137
 In the present case, the "glaring loophole" found in Connell does not exist; no congressional purpose is undermined by the union conduct at issue. Instead, the agreements sought are fully consistent with the declared legislative purpose of maintaining the pattern of collective bargaining as it existed in the construction industry prior to 1959. In such a situation, we believe that it is not the province of this court to ignore the literal wording of the statute and impose a significant limitation that is not expressly included in the statute. Any further modification of the statute must come from Congress.
 
 
 138
 For all of these reasons, we refuse to follow the holding of the panel of the Ninth Circuit in Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB, 609 F.2d 1341 (9th Cir. 1979), rehearing en banc granted, No. 78-3469 (9th Cir. Aug. 19, 1980). We believe that the panel decision has misinterpreted the legislative history and has too narrowly construed the purpose behind the construction industry proviso to § 8(e).[30]
 
 
 139
 B. The Relevance of Physical Presence at the Jobsite
 
 
 140
 There is an additional and more refined argument of the employers in this case that must also be addressed. We have concluded that subcontracting agreements exist in the construction industry for at least two separate reasons. First, subcontracting agreements are allowed so that unions may protect established contract standards against the threat posed by the prevalence of subcontracting and the short term nature of employment in the construction industry. Second, once union workers are employed on a jobsite, subcontracting agreements are allowed so that those workers will not be forced to work alongside nonunion workers on the same jobsite.
 
 
 141
 The employers in this case have focused most of their attention on the first of these major concerns. The employers also have argued, however, that subcontracting agreements should not be allowed to extend beyond the time when signatory union workers are physically present on the jobsite. In other words, the argument runs, even though the signatory union is utilized on the jobsite, thus satisfying the first major concern above, there are times when subcontracted work is performed and the signatory craft is not simultaneously working on the jobsite and, thus, at such times, the second major concern above is not applicable.
 
 
 142
 We decline to accept this argument in the present case. We believe that to do so would be overly formalistic and once again ignore the realities of employment situations on a construction jobsite.
 
 
 143
 It is firmly established, and not here contested, that at the very least, subcontracting agreements are allowed in the construction industry because of the "close community of interests" existing on a construction site and "the frictions that may arise" when union workers are employed along with nonunion workers on the same project. See Connell, supra, 421 U.S. at 630, 95 S.Ct. at 1838. We do not believe these statements to mean, however, that problems arise solely when union workers are forced to work "elbow-to-elbow" with other nonunion workers.
 
 
 144
 More realistically, "friction" may arise when two sets of workers are employed on a common construction site under substantially different employment conditions. It is true that, nominally, different crafts on the project are likely to have separate employers. While the Supreme Court established, in NLRB v. Denver Building and Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), that these employers on a common jobsite remain separate and distinct, Congress recognized in § 8(e) that there is a very special relationship between them. The entire thrust of the proviso to § 8(e) is that craft work on a construction site cannot be treated as isolated and removed from other craft work.
 
 
 145
 There is simply nothing in the legislative history of the proviso to § 8(e), or in practices in the construction industry prior to 1959, to suggest the limitation urged by the employers here. Accordingly, we affirm the position of the Board and hold that subcontracting agreements need not be so limited. In doing so, however, we wish to emphasize that it is impossible for this court to anticipate every possible variation that may arise concerning subcontracting arrangements on a construction jobsite. There may be situations where the relationship between craft work on a jobsite is so remote, so removed in time of performance, that one craft would have no interest in how work is performed by another craft. While we do not believe the subcontracting agreements in the present case to be beyond the scope of the proviso to § 8(e), we leave the final limits of the protection afforded by the proviso to be decided in future cases, where specific factual events will illuminate problems and issues in a manner much clearer than that presented by the very general facts of this case.
 
 C. The Legality of Union-Specific Clauses
 
 146
 Finally, the employers argue, in a somewhat cursory fashion, that the subcontracting agreements at issue here are beyond the scope of the proviso to § 8(e) because the agreements permit subcontracting only with particular unions affiliated with the Trades Council.
 
 
 147
 The Supreme Court in Connell noted that the subcontracting agreement at issue in that case prohibited subcontracting to any firm that did not have an agreement with the specific union local, giving the union "complete control over subcontract work offered by general contractors that had signed (the subcontracting) agreements." 421 U.S. at 624, 95 S.Ct. at 1836. The Court went on to state:
 
 
 148
 Such control could result in significant adverse effects on the market and on consumers-effects unrelated to the union's legitimate goals of organizing workers and standardizing working conditions.
 
 
 149
 Id. Since the Court held that the subcontracting agreements in Connell were not protected by the proviso to § 8(e) because not sought in the context of a collective bargaining relationship, the Court did not resolve whether union-specific subcontracting agreements are outside the scope of the proviso.
 
 
 150
 Neither the employers nor the amici point to any case that has accepted this limitation on the proviso. The Board in fact has consistently upheld the validity of union-specific agreements. As recognized by the Board in Woelke & Romero Framing, supra, 239 N.L.R.B. 241 (1978):
 
 
 151
 Since the enactment of the 1959 amendments to the Act, the Board and courts have consistently upheld contract provisions between employers and unions in the construction industry which permit the employer to subcontract work to be performed at the site of the construction only to subcontractors who are signatory to contracts either with a particular union or with unions having jurisdiction over the type of work involved.
 
 
 152
 Id. at 247.[31] Although the panel of the Ninth Circuit in Pacific Northwest, supra, reversed much of Woelke & Romero Framing and placed other severe restrictions on the scope of the construction industry proviso, the panel opinion nevertheless explicitly refused to limit the proviso to § 8(e) to subcontracting agreements that are not "particular union" agreements. See 609 F.2d at 1350 n.8.
 
 
 153
 We agree with the view that union-specific subcontracting agreements are within the scope of the construction industry proviso to § 8(e). Although we are not called upon to weigh "the union's legitimate goals of organizing workers and standardizing working conditions" against any "significant adverse effects on the market and on consumers," we believe that in this case these legitimate union goals are in fact sufficient to justify union-specific agreements. We once again note that there is nothing in the literal wording of the statute suggesting the limitation that the employers here seek. Nor is there any overriding congressional purpose that would be undermined if § 8(e) is construed to permit union-specific agreements, such as that which caused the Supreme Court to avoid the literal language of the Act in Connell.
 
 
 154
 Instead, we believe that the legislative history supports the proposition that subcontracting agreements in the construction industry may be union-specific. As fully developed above, the principal concern of Congress in enacting the construction industry proviso was to preserve the pattern and practice of bargaining in the construction industry. There is evidence that nearly all subcontracting agreements in existence in the construction industry in 1959 were in fact union-specific agreements.
 
 
 155
 As described above, a comprehensive study was conducted of subcontracting agreements in existence at the time of the 1959 amendments to the NLRA. Lunden, Subcontracting Agreements in Major Contracts, 84 Monthly Labor Review 579 (part I), 715 (part II) (1961). That study included a survey of major contracts in the construction industry, 83 of which contained subcontracting agreements.
 
 
 156
 The findings of the survey are again relevant here. As stated by the study:
 
 
 157
 The single most frequent requirement, found in more than 50 major contracts, called for the subcontractor to comply with all the terms and conditions of the prime employer's agreement.
 
 
 158
 Id. at 715. In Local 437, IBEW, 180 N.L.R.B. 420 (1969), the Board specifically established that such clauses permit subcontracting only to employers who have recognized the signatory union, since the phrase "complying with the terms of this agreement" covers union recognition as well as all other terms. 180 N.L.R.B. at 420. Accord, Building and Construction Trades Council v. NLRB, 328 F.2d 540 (D.C.Cir.1964).
 
 The study also noted:
 
 159
 Closely allied to this approach was a second large group of construction industry contracts which required the subcontractor to be under agreement with the same local, with another local of the same international union, with a recognized building trades union, or with an AFL-CIO affiliate.
 
 
 160
 84 Monthly Labor Review at 716. Union-specific subcontracting agreements were clearly common in the construction industry at the time of the enactment of § 8(e).
 
 
 161
 We also believe that union-specific subcontracting agreements are consistent with the purposes of § 8(e). As fully developed above, the purpose of the construction industry proviso to § 8(e) is not simply to permit a union on a jobsite to ensure that only "union" workers are present on the site, and thus avoid union-nonunion "friction."[32] It is through subcontracting agreements that a union may protect established contract standards in the construction industry. It is through subcontracting agreements that a union may guarantee payments to particular established pension funds. We believe that restricting the protection of the proviso to § 8(e) to "generic" union subcontractors is inconsistent with these legitimate union goals. Absent some compelling reason such as that present in Connell, we refuse to ignore the literal wording of the statute and adopt such a restriction.[33]
 
 D. Deference to the Board
 
 162
 For all of the reasons presented above, we believe that the Board's interpretation of the scope of the construction industry proviso to § 8(e) is entirely consistent with the legislative history of that section and the purposes for which it was enacted. In closing, we note that in matters of statutory construction, we are bound to give considerable deference to the interpretation of the statute by the Board. NLRB v. Broadcast Employees and Technicians Local 31, 631 F.2d 944, at 949 (D.C.Cir.1980). As stated by the Supreme Court in Iron Workers :
 
 
 163
 Courts may prefer a different application of the relevant sections, but "(t) he function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." NLRB v. Truck Drivers, 353 U.S. 87, 96 (77 S.Ct. 643, 647, 1 L.Ed.2d 676) (1957); NLRB v. Insurance Agents, 361 U.S. 477, 499 (80 S.Ct. 419, 432, 4 L.Ed.2d 454) (1960).
 
 
 164
 434 U.S. 335 at 350, 98 S.Ct. 651 at 660, 54 L.Ed.2d 586 (1978). We certainly cannot say, as was said in American Ship Building Co. v. NLRB, 380 U.S. 300, 318, 85 S.Ct. 955, 967, 13 L.Ed.2d 855 (1965), that the position taken by the Board is "fundamentally inconsistent with the structure of the Act and the function of the sections relied upon."
 
 
 165
 In summary, we hold that the subcontracting agreements in the present case are within the scope of the construction industry proviso to § 8(e). Accordingly, the pressure exerted to secure the agreements did not violate § 8(b)(4)(A).
 
 
 166
 V. THE SELF-ENFORCEMENT FEATURE OF THE AGREEMENTS
 
 
 167
 One final issue remains. Although the Board did not find that the subcontracting agreements violated § 8(e) for any of the reasons discussed above, the Board did conclude that the agreements lost the protection of § 8(e) by reason of the fact that section 306 of the Master Labor Agreement authorized the unions to take "any" action to enforce "any" settlement or decision obtained in the grievance and arbitration procedure.[34] The Board found that this provision of the contract authorized economic action by the unions to enforce the subcontracting restrictions. 239 N.L.R.B. 264, at 270-71.[35] Since subcontracting agreements may not be enforced through economic action, the Board ordered the unions to cease and desist from pressuring the contractors to enter into an agreement that is prohibited by § 8(e) by reason of self-enforcement provisions. Id. at 271-72.
 
 
 168
 The unions here argue that the contract does not authorize self-help measures to enforce the subcontracting agreements. Moreover, the unions contend that there has been no showing of an intent at any time to use the "self-help" provision to justify economic action to enforce the subcontracting agreements, and that the Board should not engage in "speculation" that the provision will be utilized in an unlawful manner. Accordingly, the unions request that the cease and desist order be vacated by this court.[36]
 
 
 169
 We reject the argument advanced by the unions and enforce the order of the Board. As all parties indeed admit, subcontracting agreements lose the protection of the construction industry proviso if they contain terms that sanction employee strikes or other self-help measures to enforce the agreement. Bricklayers Local 2 v. NLRB, 562 F.2d 775, 787-88 (D.C.Cir.1977). Section 306 of the Master Labor Agreement applies to any settlement or decision of the grievance-arbitration process, and thus would appear to include a decision concerning the subcontracting agreements within its coverage. We do not believe that the unions' mere disclaimer of intent to utilize that provision to enforce the subcontracting agreements is sufficient to cure this defect in the contract.[37]
 
 
 170
 As a result, we agree that the subcontracting agreements in the present case are not protected by the construction industry proviso to § 8(e). For the reason advanced by the Board, we order the unions to comply with all aspects of the Board's order.
 
 VI. CONCLUSION
 
 171
 In No. 78-2177, we dismiss the petition of Donald Schriver, Inc., Sullivan-Kelley & Associates, Topaz Contracting & Development Company, Inc., and Sullivan and Associates to review and modify the decision of the National Labor Relations Board reported at 239 N.L.R.B. 264 (1978). In No. 79-1001, we enforce the order of the Board issued against Local 1497, United Brotherhood of Carpenters and Joiners of America; Local 1752, United Brotherhood of Carpenters and Joiners of America; the Los Angeles Building and Construction Trades Council; and the Los Angeles County District Council of Carpenters in that same proceeding.
 
 
 172
 So ordered.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a) (1976)
 
 
 [1]
 On June 20, 1975, two charges were filed by Sullivan-Kelley & Associates against the Los Angeles Building and Construction Trades Council and Local 1497, United Brotherhood of Carpenters and Joiners of America. Joint Appendix (App.) 5, 7. On March 9, 1977, one set of charges was filed by Sullivan and Associates against the Los Angeles County District Council of Carpenters and Local 1752, United Brotherhood of Carpenters and Joiners of America. App. 23. The charges filed on March 9, 1977 were amended on March 15, 1977. App. 25
 Section 8(e) is set forth in full, infra, at note 5.
 
 
 [2]
 "App." refers to the Joint Appendix submitted by the parties
 
 
 [3]
 References are to the stipulation of facts submitted by the parties to the Board, reprinted in the Joint Appendix and designated by numbered paragraphs
 
 
 [4]
 29 U.S.C. § 158(f) (1976). That section provides:
 It shall not be an unfair labor practice under subsections (a) and (b) of this section for an employer engaged primarily in the building and construction industry to make an agreement covering employees engaged (or who, upon their employment, will be engaged) in the building and construction industry with a labor organization of which building and construction employees are members (not established, maintained, or assisted by any action defined in subsection (a) of this section as an unfair labor practice) because (1) the majority status of such labor organization has not been established under the provisions of section 159 of this title prior to the making of such agreement, or (2) such agreement requires as a condition of employment, membership in such labor organization after the seventh day following the beginning of such employment or the effective date of the agreement, whichever is later, or (3) such agreement requires the employer to notify such labor organization of opportunities for employment with such employer, or gives such labor organization an opportunity to refer qualified applicants for such employment, or (4) such agreement specifies minimum training or experience qualifications for employment or provides for priority in opportunities for employment based upon length of service with such employer, in the industry or in the particular geographical area: Provided, That nothing in this subsection shall set aside the final proviso to subsection (a)(3) of this section: Provided further, That any agreement which would be invalid, but for clause (1) of this subsection, shall not be a bar to a petition filed pursuant to section 159(c) or 159(e) of this title.
 
 
 [5]
 29 U.S.C. § 158(e)(1976). Section 8(e) provides:
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work: Provided further, That for the purposes of this subsection and subsection (b)(4)(B) of this section the terms "any employer", "any person engaged in commerce or an industry affecting commerce", and "any person" when used in relation to the terms "any other producer, processor, or manufacturer", "any other employer", or "any other person" shall not include persons in the relation of a jobber, manufacturer, contractor, or subcontractor working on the goods or premises of the jobber or manufacturer or performing parts of an integrated process of production in the apparel and clothing industry: Provided further, That nothing in this subchapter shall prohibit the enforcement of any agreement which is within the foregoing exception.
 
 
 [6]
 In conjunction with the present case, reported at 239 N.L.R.B. 264 (1978), the Board decided the following cases: Carpenters Local 944 (Woelke & Romero Framing), 239 N.L.R.B. 241 (1978); Colorado Building & Construction Trades Council, 239 N.L.R.B. 253 (1978); and Operating Engineers Local 701 (Associated Builders), 239 N.L.R.B. 274 (1978). Woelke & Romero Framing and Associated Builders were reversed in a panel decision of the Ninth Circuit, Pacific Northwest Chapter of the Associated Builders & Contractors, Inc. v. NLRB, 609 F.2d 1341 (9th Cir. 1979), rehearing en banc granted, No. 78-3469 (9th Cir. Aug. 19, 1980)
 
 
 [7]
 Two members of the Board dissented from this aspect of the decision. See 239 N.L.R.B. 264 at 270, nn.26 & 28
 
 
 [8]
 Section 10(f), 29 U.S.C. § 160(f) (1976), provides in pertinent part that "(a)ny person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia."
 Although the matter has never been raised by any party, we discuss briefly whether the contractors have standing to seek review of the Board's decision and orders. Since the Board orders here were issued against the unions, it could be argued that the employers are not "aggrieved" parties within the meaning of § 10(f). However, given the posture of these cases, including the specific findings of the Board on several material issues, we hold that the employers do have standing to seek review of the Board's decision. The Board clearly "den(ied) in whole or in part the relief sought" by the contractors, as set forth in § 10(f). The employers may have obtained some relief by virtue of the Board's orders, but it was far from the relief that they sought. The Board's orders simply required the unions to cease and desist from enforcing or attempting to secure agreements that are prohibited by § 8(e) "by reason of self-enforcement provisions." See 239 N.L.R.B. 264 at 271-72 (emphasis supplied). The Board did not order the unions to cease and desist from attempting to secure the subcontracting restrictions absent self-enforcement measures; the Board specifically ruled that such clauses standing alone were protected by § 8(e). Thus, the employers were denied the principal relief that they sought before the Board, and are thus "aggrieved" parties within the meaning of § 10(f).
 This conclusion is supported by other cases in this circuit. In Truck Drivers and Helpers Local 728 v. NLRB, 386 F.2d 643 (D.C.Cir. 1967), the Board had found that an employer had violated § 8(a)(1) of the Act, but had refused to consider whether § 8(a)(3) had also been violated because of the remedy afforded the union by reason of the violation of § 8(a)(1). This court nevertheless accepted the union's petition to review the Board order. As stated by the court, "the failure of the Board to grant the additional relief sought renders the Union a 'person aggrieved' by the Board's order within the meaning of § 10(f) of the Act, 29 U.S.C. § 160(f)." 386 F.2d at 644. See also Textile Workers Union of America v. NLRB, 475 F.2d 973, 974 n.2 (D.C. Cir. 1973).
 
 
 [9]
 Section 8(f) is set forth in full at note 4, supra
 
 
 [10]
 Under normal "contract-bar" rules, an election petition for representative status may not be filed during the term of a collective bargaining agreement that has a duration of up to three years, or during the first three years of an agreement of longer duration, except during an open period 60-90 days prior to the expiration date of the contract. General Cable Corp., 139 N.L.R.B. 1123 (1962)
 
 
 [11]
 The employers in this case have briefly argued that any picketing to secure an § 8(f) agreement is unlawful. In support of this argument, the employers point to the Supreme Court opinion in Iron Workers, supra, where the Court examined the legislative history to § 8(f) and concluded, "Congress was careful to make its intention clear that prehire agreements were to be arrived at voluntarily, and no element of coercion was to be admitted into the narrow exception being established to the majority principle." 434 U.S. at 348 n.10, 98 S.Ct. at 659 n.10
 Counsel for the Board in the present case admits that "in enacting Section 8(f) ... Congress did not intend to authorize minority construction unions to strike, picket, or otherwise coerce employers to sign § 8(f) agreements." Appellee's brief, p. 14. However, as the Supreme Court suggests in Sears, supra, this can mean no more than that a union may not picket in excess of 30 days without filing a petition for an election under § 9(c), as set forth in § 8(b)(7)(C). Otherwise, a charge of unlawful picketing to secure an § 8(f) agreement would be meaningless. The union would have a complete defense by simply claiming that it intended to file a § 9(c) representation petition within 30 days.
 We recognize that a question may be raised in the rare instance when a union pickets to secure an § 8(f) agreement and, due to the fact that no workers are employed at the time of the picketing, a representational election is not possible. See NLRB v. Local 542, supra. We need not and do not consider whether coercion to secure an § 8(f) agreement in such a situation violates the Act. In the present case, both Schriver and Topaz employed carpentry workers who were eligible to vote in a representational election. Thus the coercion employed to secure the § 8(f) agreements (such as the 10 day picketing of Topaz) did not violate the Act.
 
 
 [12]
 Section 8(e) is set forth in full at note 5, supra
 
 
 [13]
 For a more complete analysis, see R. Gorman, Basic Text on Labor Law 240-73 (1976)
 
 
 [14]
 Section 8(b)(4) provides, in relevant part, that it shall be an unfair labor practice for a labor organization or its agents:
 (i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is-
 (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section;
 (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title: Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing(.)
 29 U.S.C. § 158(b)(4) (1976) (emphasis supplied).
 
 
 [15]
 The employers in this case have also argued that picketing to secure any § 8(e) agreement is unlawful, even if the agreement is within the protection of the construction industry proviso. Courts have repeatedly rejected this argument, for the statute is clear. Section 8(b)(4)(A) only prohibits coercion to secure an agreement "which is prohibited by subsection (e) of this section." 29 U.S.C. § 158(b)(4)(A). An agreement protected by the construction industry proviso is not prohibited by § 8(e), and thus picketing to secure such an agreement does not violate § 8(b)(4)(A). Orange Belt District Council of Painters No. 48 v. NLRB, 328 F.2d 534, 537 (D.C. Cir. 1964); Essex County District Council of Carpenters v. NLRB, 332 F.2d 636, 641 (3d Cir. 1964); Construction Laborers Local 383 v. NLRB, 323 F.2d 422, 425 (9th Cir. 1963). As directly stated by this court in Orange Belt, supra, at 537: "Secondary subcontracting clauses in the construction industry are lawful, under the proviso to Section 8(e), and economic force may be used to obtain them notwithstanding Section 8(b)(4)(A), because Section 8(b)(4)(A) incorporates that proviso by reference" (footnotes omitted). Coercion used to secure an agreement protected by the construction industry proviso to § 8(e) does not violate § 8(b)(4)(A). Cf. NLRB v. Pipefitters Local 638, 429 U.S. 507, 97 S.Ct. 891, 51 L.Ed.2d 1 (1977)
 
 
 [16]
 Section 8(b)(4)(B) is set forth at note 14, supra
 
 
 [17]
 The complaint did not allege that the threats of picketing against Schriver were made in an attempt to enforce an § 8(f) agreement, or to bring about a cessation of business with any of Schriver's nonunion subcontractors. Similarly, the complaint did not claim that the unions picketed the Claremont project in an attempt to pressure the neutral owner-builder to terminate its subcontract with Topaz. The only charges brought in this case, and the only complaints issued by the Board, allege that the unions unlawfully pressured the contractors to enter into subcontracting agreements prohibited by § 8(e), and in so doing violated § 8(b)(4)(A). See App. 5, 7, 14, 15, 23, 25, 32 and 49
 
 
 [18]
 The employers' association and several craft unions were already parties to current collective bargaining agreements, many of which had omitted subcontracting clauses. 396 F.2d at 678, 681
 
 
 [19]
 The trades council argued unsuccessfully that the subcontracting agreement had only a minor, secondary effect on the signatory contractors' employees. 396 F.2d at 681
 
 
 [20]
 The union again disclaimed any interest in recognition, and the agreement expressly provided that the subcontracting limitation applied only to work that the contractor did not perform with his own employees and instead uniformly subcontracted to other firms. See 483 F.2d at 1156 n.1
 
 
 [21]
 Of course, the subcontracting clauses included within the prehire agreements had certain secondary objectives. Such objectives are made lawful, however, by the construction industry proviso to § 8(e). The sole question before us here is whether a prehire agreement, covering the full conditions of employment of a contractor's own employees, is sufficient to satisfy the collective bargaining requirement of Connell
 
 
 [22]
 Although clearly not faced with the issue, the Supreme Court suggested in Connell that the existence of an § 8(f) prehire agreement may be sufficient to satisfy the collective bargaining requirement. In Connell, the union argued that the Board had previously authorized subcontracting agreements with "stranger" contractors, citing a case in which the Board had upheld an Administrative Law Judge's conclusion that § 8(e) did not prohibit a restrictive subcontracting agreement between a union and a general contractor who used none of his own employees on the particular construction project. Los Angeles Building & Construction Trades Council, 214 N.L.R.B. 562 (1974). In rejecting the argument, the Supreme Court noted that in that case, "(t)he agreement in question may have been a prehire contract under § 8(f), and it is not clear that the contractor argued that it was invalid for lack of a collective-bargaining relationship." 421 U.S. at 631 n.10, 95 S.Ct. at 1839 n.10 (emphasis supplied). We do not mean to imply that this off-hand statement is a ringing endorsement of the legality of a subcontracting provision contained in an § 8(f) agreement, and recognize that this statement could support either argument. The implication is present, however, that the existence of a prehire agreement makes Los Angeles Building & Construction Trades Council very different from the situation presented in Connell
 
 
 [23]
 For a good description of the advantages of an established labor agreement for employer-contractors, see Pierson, Building Trades Bargaining in Southern California, 70 Monthly Labor Review 14, at 14 (1950)
 
 
 [24]
 This was suggested during the oral argument before this court when counsel for the employers stated: "As a policy matter, § 8(b)(7) is not an effective remedy. The reason it is not an effective remedy is because it isn't just picketing for 30 days. As a practical matter, the union, the way the Board this is not the question before this court but the way the Board has interpreted § 8(b)(7) the union can picket for 75 and 100 days.... So § 8(b)(7) does not solve this problem." It is noteworthy that counsel did not contend that § 8(b)(7) was unavailable to deal with recognitional picketing; rather, he contended that the statutory proscription and remedy were not always effective to serve employer interests
 
 
 [25]
 The Supreme Court also did not determine the purpose behind the construction industry proviso. Although noting that the proviso may have been enacted because of the close community of interests on the jobsite, or even simply to alleviate the frictions that arise when union and nonunion workers are employed together, the Court did not decide the question since the union in Connell did not suggest that its subcontracting agreement related to any of those policies. 421 U.S. at 630-31, 95 S.Ct. at 1838-39
 
 
 [26]
 A secondary agreement voluntarily entered into could be "enforced" through the grievance procedure, by judicial action, or by promises of a "tougher than usual" stance of the union at the next contract negotiation or grievance adjustment. See R. Gorman, Basic Text on Labor Law 262 (1976)
 
 
 [27]
 The Bureau of Labor Statistics compiled 1,687 major collective bargaining agreements covering 1,000 or more workers each, or "virtually all agreements of this size in the United States exclusive of those in the railroad and airline industries." Id. at 581
 
 
 [28]
 Woelke & Romero Framing was reversed by a panel of the Ninth Circuit in Pacific Northwest, supra, rehearing en banc granted, No. 78-3469 (9th Cir. Aug. 19, 1980)
 
 
 [29]
 We note that there is a remote, hypothetical situation in which the employers' argument could come into play. Conceivably, a general contractor could be engaged at a future jobsite where he did not use any carpenters, union or nonunion. If a prehire agreement with a carpenters' union required that he subcontract work on that jobsite to union plumbers and union electricians, that agreement might arguably be beyond the scope of the proviso to § 8(e). Since no carpenters are employed on the jobsite, there can be no interest in maintaining contract standards for carpentry workers. Similarly, since no carpenters are ever on the jobsite, there can be no friction between union carpenters and other nonunion workers
 This hypothetical situation is not presented here, however. Certainly on all jobsites involved in this case, the employers used carpentry workers. More importantly, we do not believe that the subcontracting agreements at issue would themselves restrict subcontracting in the above hypothetical situation. As stipulated by the parties, the subcontracting agreements apply "at anytime and any construction jobsite within the definition of the construction proviso to Section 8(e) of the NLRA, as amended, where work within the jurisdiction of Respondents is being performed, regardless of whether or not members of Respondents are present at any given time at any given site." App. 87, P 85. In the above hypothetical situation, it would appear that work within the jurisdiction of the union was not being performed. In any event, since the situation is not presented by the facts of this case and has not been addressed by the parties, we leave its resolution to another day.
 
 
 [30]
 Without repeating the analysis presented above, we respectfully disagree with the panel opinion of the Ninth Circuit on several points. The court reached its conclusion through a series of steps. First, the court concluded that the Sand Door case, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186, did not conclusively establish the legality and scope of subcontracting agreements prior to 1959. 609 F.2d at 1348-49. Second, the Ninth Circuit concluded that it is not entirely clear that the construction industry proviso was intended to preserve the existing state of the law in the industry, since the proviso added a limitation of "jobsite work" that did not exist prior to 1959. Id. at 1349. Finally, finding the legislative history to be inconclusive, the court considered the purpose of the proviso and concluded that the sole purpose was to avoid union-nonunion jobsite friction. Id. at 1349-50. Accordingly, the court limited the permissible scope of the proviso to union-nonunion conflicts on the jobsite
 We believe that the court has misapplied the legislative history of § 8(e). Regardless of whether or not Sand Door conclusively resolved the legality of subcontracting agreements, no court had ever held such agreements to be unlawful prior to 1959, or had in any way narrowed their scope. As developed above, we believe that Congress perceived in 1959 that decisions of the Board and the courts had created "loopholes" by which secondary agreements voluntarily entered were lawful, and enacted § 8(e) to change that result outside the construction and apparel industries. As stated in Brown v. General Services Administration, 425 U.S. 820, 828, 96 S.Ct. 1961, 1965, 48 L.Ed.2d 402 (1976), "the relevant inquiry is not whether Congress correctly perceived the then state of the law, but rather what its perception of the state of the law was."
 In addition, to us it is beyond dispute that Congress intended to leave the current state of the construction industry unchanged, concerning the subcontracting of work to be done at the jobsite. The fact that Congress limited the proviso to jobsite work does not in any way affect the legality or scope of subcontracting agreements that do in fact concern work completed at the jobsite.
 Most importantly, we believe that the Ninth Circuit panel decision defined the purpose of the construction industry proviso to § 8(e) too narrowly. Although the elimination of jobsite friction is indeed a legitimate concern, we believe that subcontracting agreements existed and continue to exist in the construction industry as a means of protecting contract standards, a goal made difficult as a result of the prevalence of subcontracting in that industry and the temporary and transitory nature of employment.
 
 
 [31]
 See also Carpenters Local 15, 240 N.L.R.B. No. 52 (Jan. 25, 1979)
 
 
 [32]
 As recognized by the ALJ in Carpenters Local 15, 240 N.L.R.B. No. 52 at 16 (Jan. 25, 1979): "To construe the proviso as authorizing only such agreements as limit subcontracting to unionized companies would also make a mockery of the protection afforded thereby, for it could be circumvented by any group of employees which chose to style themselves 'union.' "
 Even if avoiding "friction" on the jobsite was the sole consideration, there is no guarantee that there is less friction on a jobsite when members of competing unions are forced to work alongside each other, than when union and nonunion workers are employed on the same jobsite. See Pacific Northwest, supra, at 1350 n.8; Carpenters Local 15, supra, at 16 n.17.
 
 
 [33]
 We recognize that one implication of this holding is that a subcontractor signatory to a contract with a competing union may be frozen out of work with a contractor who signs a union-specific subcontracting agreement with another union. Certainly this consideration must be balanced against the concerns expressed above. In doing so, however, we were influenced by a finding of an ALJ that was affirmed by the Board in Carpenters Local 15, supra. In upholding union-specific subcontracting agreements and rejecting this problem, the ALJ noted: "(T)he problem is more theoretical than real. Except for some slight overlapping of functions here and there, there is usually only a single union that represents each particular craft in the construction industry." Id. at 17. There is nothing in the record of this case to suggest otherwise
 
 
 [34]
 Section 306 of the Master Labor Agreement is set forth in full, in the text of the opinion in part I.A
 
 
 [35]
 Two members of the Board dissented from this aspect of the Board's decision. 239 N.L.R.B. 264, at 270 nn.26 & 28
 
 
 [36]
 The unions do not urge this position very strongly. At oral argument, one union counsel conceded this "self-help" aspect of the case was touched in the brief "in a very minor, minor way," and that the unions "are quite content with the Board order." Counsel also noted in oral argument that the contract has already been amended to clarify the problem and now expressly prohibits the use of economic action to enforce the subcontracting agreements
 
 
 [37]
 We note that a similar problem concerning a different aspect of the construction industry proviso was presented to the Ninth Circuit in Operating Engineers Local 701 v. NLRB, 578 F.2d 841 (9th Cir. 1978). As resolved by that court: "In the Union's view, while the clause states that it covers work performed 'at or near' the jobsite, the clause has actually been interpreted to mean 'on' the jobsite, and as so interpreted, the clause falls within the proviso. We find this argument unpersuasive. The clause must be considered to mean what it says." Id. at 842